# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| **DAVE MUSTO, et al.**, | Case No. 2:17-cv-506 |
| Plaintiffs, | |
| v. | Judge Graham |
| **PAULA ZARO**, | Magistrate Judge Deavers |
| Defendant. | |

## OPINION & ORDER

This matter is before the Court on Defendants' Motion to Dismiss for Lack of Personal Jurisdiction. (Doc. 7).

**I. Factual Background**

The Court derives the factual background from the Complaint and its attachment, (Docs. 2, 2-1), affidavits submitted with the motion briefing, (*see, e.g.*, Zaro Aff., Doc. 7-1), and some exhibits attached to the affidavits, (*see* Docs. 9-3–9-13).

Paula Zaro, the Defendant, owned a dog named Pepe[1]. Zaro gave Pepe to Dave Musto and Kathy Caton-Musto (referred collectively as the "Mustos") to train him to be a champion show dog. After Zaro heard that Pepe wasn't doing well under the care and tutelage of the Mustos, she went to see Pepe at a dog show in Kentucky, but she didn't notify the Mustos that she would be there. Upon seeing Pepe, Zaro opened the cage, took Pepe, and absconded with him. The Mustos returned to Pepe's cage to find him missing. Chaos ensued. Only later did Zaro tell the Mustos that she had taken Pepe back.

Plaintiffs[2] sued Zaro, asserting twelve causes of action, including claims for breach of contract, intentional infliction of emotional distress, defamation, and tortious interference with business relationships. Much of the factual support for these causes of action falls into two groups. The first group of facts concerns the agreement (or lack thereof) between Plaintiffs and

---

[1] Pepe's full name is *Piece of the Puzzle Sangue Magnifica*. (Compl. Ex. A, Doc. 2-1).
[2] Lucy Parschauer is also a plaintiff; she would have co-ownership rights to Pepe under the parties' alleged contract: the "Owner-Sponsor Agreement." (*See* Doc. 2-1).

1

Zaro regarding Pepe. These facts support the breach-of-contract and related claims. The second group of facts concerns statements made by Zaro regarding Plaintiffs. These facts support the defamation and related claims. The Court reviews both sets of facts in turn.

First, the Court reviews the facts alleged about an agreement regarding Pepe. Zaro contacted Dave Musto on November 3, 2016 to solicit advice on how to best travel with Pepe internationally. (Dave Musto Aff. at ¶ 4, Doc. 9-1). Dave Musto complied, sending her some advice via email. (*See* Ex. A, Doc. 9-3). On December 15, 2016, Zaro sent Dave Musto another message asking how to promote Pepe, including how he could earn sufficient points to become a champion show dog. (Dave Musto Aff. at ¶ 5). Zaro and Dave Musto agreed that Zaro would bring Pepe to a dog show in Erie, Pennsylvania where the Mustos would be. (*Id.*). Kathy Caton-Musto registered Pepe for the Erie, Pennsylvania show, which was set for January 28-29, 2017. (*Id.*). Zaro brought Pepe from Massachusetts for the Erie show, and Kathy Caton-Musto showed Pepe that day. (Dave Musto Aff. at ¶¶ 11–12). Zaro and Kathy Caton-Musto met the next day, and, according to the Mustos, Zaro agreed to give Pepe to the Mustos to "campaign" him to achieve champion status. (*Id.* at ¶ 13). The Mustos then took Pepe to their home in Delaware, Ohio.

Zaro and the Mustos had numerous discussions over phone, text, and email through December 2016 and January 2017 leading up to Zaro giving Pepe to the Mustos. The Mustos prepared an "Owner-Sponsor Agreement," which they say reflects the terms discussed with Zaro "regarding the potential breeder/handler relationship." (*Id.* at ¶ 6). The parties communicated about the terms of the Owner-Sponsor Agreement numerous times over the course of these two months.

The Owner-Sponsor Agreement (the "Agreement") says that Dave Musto and Lucy Parschauer would be co-owners of Pepe with Zaro; Dave Musto and Mrs. Parschauer would also be Pepe's "sponsors," meaning they would pay all fees associated with "campaigning" Pepe. (Agreement, Doc. 2-1). This included fees for handling, boarding, conditioning, and advertising Pepe. (*Id.* at 2). Kathy Caton-Musto would be Pepe's handler, and she would take Pepe to compete in whatever dog shows she thought best. (*Id.* at 3). In return for their labor with Pepe, Mrs. Parschauer and Dave Musto would receive 100% of the first four stud fees for Pepe, and the fees would be split 50/50 between Zaro and the co-owners after that. (*Id.* at 4). The Agreement identified Delaware County, Ohio as the venue for any legal action. (*Id.* at 6). The Agreement is not signed by any party. (*Id.* at 6–7).

The parties had other communication about a deal for Pepe. Text messages between Kathy Caton-Musto and Zaro show that they agreed that if Pepe did not "work out as a 'campaigning' special, then you [Zaro] will have yourself a new champion at no cost." (Doc. 9-6 at PageID 216). On February 1, 2017, Zaro sent a message to Dave Musto asking for his address "for co-own transfer." (Ex. F, Doc. 9-8). Dave Musto says that he understood this to mean that Zaro was "going to sign Pepe's AKC Registration and send it to me so that Mrs. Parschauer and I could also sign it, which would memorialize that Ms. Zaro had agreed to both of us becoming co-owners of Pepe." (Dave Musto Aff. at ¶ 15). Two weeks later, Zaro told Dave Musto that, after looking for the AKC Registration, she couldn't locate it and had asked for a replacement registration and would mail it to him when she received it. (*Id.* at ¶ 18; Ex. G).

Throughout February and March 2017, the Mustos showed Pepe at various dog shows, accruing enough "points" to have Pepe ranked as "the #4 AKC Cane Corso." (*Id.* at ¶ 19). Dave Musto claims that on March 1, 2017, Zaro "communicated to my wife and I that she agreed to the Backing Contract [the Owner-Sponsor Agreement]." (*Id.* at ¶ 21). On March 7, Dave Musto asked Zaro if she would "send a copy of the signed agreement." (*Id.* at ¶ 22). Zaro replied that she had already "mailed one out a month ago. But I'll print another and send." (Ex. I, Doc. 9-11). She never did. On March 11, 2017, Zaro stated that she had received the replacement AKC Registration for Pepe and was sending it to Ohio but was thwarted by a faulty system at her local post office. (*Id.* at ¶ 25; Ex. J, Doc. 9-12).

That brings us to March 18, 2018—the day Zaro took Pepe back. The Mustos took Pepe to Louisville, Kentucky for a dog show. The Mustos had Pepe in a crate while he awaited part of the competition. Dave Musto returned to the crate to retrieve Pepe, but Pepe was gone. Chaos ensued: the chairperson of the dog show put the property on "lock down" while many people ran, used golf carts, and drove cars, all looking for Pepe. (*Id.* at 33). The Mustos learned over the police radio that a blue minivan with Massachusetts plates had gone through a barricaded back exit that was unguarded. (*Id.*). The blue minivan was Zaro's—she had taken Pepe back, and she told Kathy Caton-Musto as much over text message: "I have my dog Pepe." (Ex. K, Doc. 9-13).

That's the first set of facts, those relating to the claim for breach of contract and related claims. The second set of facts is short, and these facts support Plaintiffs' claim of defamation and related claims.

3

The Mustos assert that Zaro "made multiple disparaging statements about [us] mistreating Pepe while he was in our possession in Ohio." (Dave Musto Aff. at ¶ 35). They provide examples of false statements from Zaro's affidavit in this case, but they don't cite any specific statements Zaro made outside of her affidavit. Plaintiffs assert that Zaro made disparaging comments through "at least telephone calls, emails, and Cane Corso forum posts to and/or viewed by others in the pure-bred dog community, including residents of the State of Ohio." (*Id.*).

Zaro asserts that she has virtually no contacts with Ohio. Zaro never went to Ohio to negotiate any agreement involving Pepe. (Zaro Aff. at ¶ 13, Doc. 7-1). Zaro has only set foot in Ohio while driving or passing through en route to another state. (*Id.* at ¶ 14). She asserts that she has never transacted business in Ohio. (*Id.* at ¶ 15).

**II. Legal Standard**

A defendant may assert by motion the defense of a lack of personal jurisdiction. Fed. R. Civ. P. 12(b)(2). The party asking a Court to assert jurisdiction bears the burden of showing that personal jurisdiction exists. *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1261–62 (6th Cir. 1996). Here, Plaintiffs ask the Court to assert jurisdiction over Zaro, so Plaintiffs bear the burden of showing personal jurisdiction exists.

Neither party requested discovery or an evidentiary hearing, so the Court will decide the motion upon the affidavits alone. *See Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). When a district court rules on a motion to dismiss for lack of personal jurisdiction "without conducting an evidentiary hearing, the court must consider the pleadings and affidavits in a light most favorable to the plaintiff." *CompuServe*, 89 F.3d at 1262. "In that instance . . . the district court should not weigh 'the controverting assertions of the party seeking dismissal.'" *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 549 (6th Cir. 2007) (quoting *Theunissen*, 935 F.2d at 1459). To defeat this motion to dismiss, Plaintiffs "need only make a prima facie showing of jurisdiction." *Id.* at 554.

Here, the Court's presented with the pleadings, affidavits, and exhibits attached thereto, including text messages, emails, a Facebook post, and the Agreement. Plaintiffs argue that since Zaro hasn't requested discovery or an evidentiary hearing on the issue, the burden remains theirs, but that burden is relatively slight, only requiring them to make a prima facie showing that personal jurisdiction exists. Moreover, Plaintiffs argue that the Court shouldn't consider any facts

that Zaro presents that conflict with Plaintiffs' allegations or facts stated in their affidavits. And while it's true that "[o]nce a defendant moves to dismiss for lack of personal jurisdiction, the plaintiff must prove that the trial court has jurisdiction over the defendant," *Barnabus Consulting Ltd. v. Riverside Health Sys., Inc.*, 2008-Ohio-3287, ¶ 12 (10th Dist. 2008), all the plaintiff must prove is a prima facie case, *id.* ("[I]n the absence of an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdiction to withstand the motion to dismiss.").

**III. Discussion**

This Court only has power over certain people and entities. To subject someone to this Court's jurisdiction, the Court must determine (1) whether the applicable state long-arm statute permits the exercise of jurisdiction, and (2) whether exercising personal jurisdiction would violate constitutional due process. *Citizens Bank v. Parnes*, 376 F. App'x 496, 501 (6th Cir. 2010). "To determine whether personal jurisdiction exists over a defendant, federal courts apply the law of the forum state, subject to the limits of the Due Process Clause of the Fourteenth Amendment." *CompuServe*, 89 F.3d at 1262. There is no "supplemental specific jurisdiction; if separate claims are pled, specific personal jurisdiction must independently exist for each claim." *Wright and Miller*, 5B Fed. Prac. & Proc. Civ. § 1351 n.30 (3d ed.); *SunCoke Energy Inc. v. MAN Ferrostaal Aktiengesellschaft*, 563 F.3d 211, 219 (6th Cir. 2009) (Rogers, J., dissenting in part[3]) (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 275 (5th Cir. 2006)); *Bd. of Forensic Document Exam'rs, Inc. (BFDE) v. Am. Bar Ass'n*, No. 16-CV-2641-JPM-TMP, 2017 WL 549031, at *5 (W.D. Tenn. Feb. 9, 2017) (same).

**A. Ohio's Long-Arm Statute**

Ohio's long-arm statute gives the Court personal jurisdiction over Zaro for each of Plaintiffs' claims. First, Ohio's long-arm statute provides jurisdiction over parties that publish defamatory statements on the internet directed at Ohio residents and other Ohio residents see those statements. *Kauffman Racing Equip., L.L.C. v. Roberts*, 126 Ohio St. 3d 81, 2010-Ohio-2551, 930 N.E.2d 784, ¶ 42. This act constitutes "[c]ausing tortious injury by an act or omission in this state." *Id.* (citing Ohio Rev. Code § 2307.382(A)(3) (Ohio long-arm statute)). Second, Plaintiffs allege that Zaro transacted business in Ohio by soliciting their expertise, negotiating a contract,

---

[3] Judge White joined Judge Rogers's dissenting opinion that "personal jurisdiction must be proper as to each claim," so that's the law in the Sixth Circuit. 563 F. 3d at 217 (White, J., concurring).

and delivering Pepe to them in Erie, Pennsylvania so he could be campaigned out of Ohio, photographed in Ohio for advertisements, with future monetary benefits to accrue while Pepe was under the Mustos' care in Ohio. This satisfies the requirements for "transacting any business in this state." Ohio Rev. Code § 2307.382(A)(1).

Zaro doesn't present argument on the long-arm statute; she quotes the entire statute in her brief without analysis. (Def.'s Mot. Dismiss at 6–7).

Here, Zaro allegedly made defamatory statements directed at Plaintiffs, and Ohio residents saw those statements. Zaro transacted business in Ohio. Therefore, Ohio's long-arm statute reaches Zaro on all of Plaintiffs' claims.

### B. The Due Process Clause

"[T]he Due Process Clause requires that the defendant have sufficient 'minimum contact[s]' with the forum state so that finding personal jurisdiction does not "offend traditional notions of fair play and substantial justice." *Conn v. Zakharov*, 667 F.3d 705, 712 (6th Cir. 2012) (quoting *Third Nat'l Bank v. WEDGE Grp., Inc.,* 882 F.2d 1087, 1089 (6th Cir. 1989)). And while there are two types of personal jurisdiction—general and specific—only specific jurisdiction is applicable here. Specific jurisdiction exists where a "defendant has 'purposefully directed' his activities at residents of the forum," and the lawsuit arises from those activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 774 (1984)).

The Sixth Circuit has a three-part test for determining whether due process permits the exercise of personal jurisdiction over a defendant:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 680 (6th Cir. 2012) (quoting *S. Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374, 381 (6th Cir. 1968)).

Here, the Court sees claims arising from two different sets of facts, and while those sets share the same main subject matter—Pepe—they involve some differences. The first set of claims is related to the alleged breach of contract of the Owner-Sponsor Agreement. The second

set of claims is related to the defamation claim, arising from Zaro's statements made about Plaintiffs.

### 1. Breach-of-Contract and Related Claims

First, does the Court have personal jurisdiction over Zaro for the breach-of-contract-related claims?

Zaro argues that she didn't have the minimum contacts required to subject her to jurisdiction in Ohio. Specifically, Zaro argues that she had no contact with Ohio other than the fact that Plaintiffs live here. Plaintiffs argue that regular contact with Ohio residents, including contact aimed at creating an agreement, submits Zaro to personal jurisdiction in Ohio.

#### i. Purposeful Availment

First, the Court analyzes whether Zaro purposefully availed herself of the privilege of acting or causing a consequence in Ohio. Where a defendant negotiates a contract by contacting an Ohio resident, sends the contract to be signed in Ohio, and that contract creates on-going rights and responsibilities in Ohio, that is enough that that a defendant "could *reasonably anticipate being haled into* an Ohio court." *Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 53 Ohio St. 3d 73, 77, 559 N.E.2d 477, 481 (1990). Similarly, "purposeful availment may exist when a defendant makes telephone calls and sends facsimiles into the forum state and such communications form the bases for the action." *Schneider v. Hardesty*, 669 F.3d 693, 702 (6th Cir. 2012) (internal quotation mark omitted) (quoting *Intera Corp. v. Henderson,* 428 F.3d 605, 616 (6th Cir. 2005)); *accord Neal v. Janssen*, 270 F.3d 328, 332 (6th Cir. 2001). In *Schneider*, representations "indicative of an intent to establish an ongoing contact, are exactly the kind of conduct recognized to constitute purposeful availment for due-process purposes." 669 F.3d at 702 (citing *Burger King*, 471 U.S. at 473). When communications are the main contact with the forum state, and the communications are not "merely incidental" but actually are at "the heart of the lawsuit," courts may exercise personal jurisdiction. *Janssen*, 270 F.3d at 332.

Here, the communications between Zaro and the Mustos go to the very heart of the claims for relief for breach of an agreement regarding Pepe. Zaro initiated this contact with the Mustos through email, phone, and text. Zaro led (or misled) the Mustos to believe that she had sent signed documents to them in Ohio, including both the Agreement and the American Kennel Club registration certificate for Pepe, which serves as a certification of his pedigree and a title of ownership. Zaro agreed to have Pepe kept in Ohio during his initial "trial" campaign. Zaro

7

agreed to have him photographed for advertisements in Ohio during that period. And while Zaro absconded with Pepe from a dog show in Kentucky, she did so knowing the Mustos were planning to return with Pepe to Ohio. All of these facts form the basis for Plaintiffs causes of action; therefore, purposeful availment exists. *See Schneider*, 669 F.3d at 702.

This case is similar to *Zobel*: where the defendants contacted the plaintiff through numerous calls and emails, defendants mailed a contract to the plaintiff, and the plaintiff transmitted funds to defendants, that constituted purposeful availment. *Zobel v. Contech Enterprises*, 170 F. Supp. 3d 1041, 1047 (S.D. Ohio 2016). Here, like in *Zobel*, Zaro made numerous calls and emails to the forum state. While Zaro points out that, unlike the defendant in *Zobel*, she never signed the Agreement, that hurts her case, because that means that—viewed in the light most favorable to Plaintiffs—she probably lied to the Mustos over text by telling them she had mailed a copy already. (Ex. I, Doc. 9-11). And while there weren't funds exchanged here, there was one important exchange: the exchange of Pepe, who was to be kept in Ohio by the Mustos. All of this shows that Plaintiffs have more than made a prima facie showing that Zaro purposefully availed herself of the benefits and burdens of the state of Ohio. Accordingly, the first prong of the minimum-contacts analysis is met.

   ii.  **Arising From**

"The second requirement is that the plaintiff's cause of action arise from the defendant's contacts with the state. This requirement is subject to a 'lenient standard.'" *Schneider*, 669 F.3d at 703. The claims for relief in this suite of claims all arise from the facts stated above. Plaintiffs state these causes of action related to the agreement regarding Pepe: (1) breach of contract, (2) unjust enrichment, (3) specific performance, (4) intentional infliction of emotional distress, (5) fraudulent inducement, (6) promissory estoppel, (7) injunctive relief, and (8) declaratory judgment. (Compl. at ¶¶ 18–61). All but one of these claims arise from the conduct identified above. For example, the contract was negotiated through communications directed by Zaro to Ohio, and these were the communications that formed the basis for Zaro delivering Pepe to the Mustos and the Mustos campaigning Pepe all over the country.

The intentional-infliction-of-emotional-distress claim is another matter. It appears that the only allegations that could possibly support this claim would be the Mustos' emotional fallout from Zaro absconding with Pepe from the dog show in Kentucky. Since this claim does not arise from contacts with Ohio, but Kentucky, the minimum-contacts test is not satisfied for this claim.

8

Accordingly, the second prong of the minimum-contacts analysis is met, except for the intentional-infliction-of-emotional-distress claim.

### iii. Substantial connection

Third, a defendant must "have a sufficiently substantial connection to the forum such that the exercise of jurisdiction is not unreasonable." *Schneider*, 669 F.3d at 703. Only unusual cases fail to meet this requirement, and in fact there's an inference that exercising jurisdiction is reasonable if the first two factors are met. *Id.* "In determining whether the exercise of jurisdiction is reasonable, the court should consider, among others, the following factors: (1) the burden on the defendant; (2) the interest of the forum state; (3) the plaintiff's interest in obtaining relief; and (4) other states' interest in securing the most efficient resolution of the [controversy]." *Air Prod.*, 503 F.3d at 554–55 (citing *Intera Corp.,* 428 F.3d at 618).

Here, there is a burden imposed on Zaro by litigating in Ohio, but the burden is not overwhelming. Zaro lives in Massachusetts, so the few events that require her personal presence in Columbus, Ohio will require significant travel. But Zaro has retained local counsel in Ohio to litigate this case. So while there will be an additional burden on Zaro to litigate in Ohio as opposed to Massachusetts, that burden is relatively slight. And, Ohio has an interest in providing "a forum for Ohio residents," so that "its residents get the benefit of their bargains." *Ky. Oaks Mall Co.*, 53 Ohio. St. 3d at 78 (second quote quoting *Wright Int'l Exp., Inc. v. Roger Dean Chevrolet, Inc.*, 689 F. Supp. 788, 791 (S.D. Ohio 1988)). In short, the exercise of jurisdiction here is not unreasonable.

Accordingly, the third prong of the minimum-contacts analysis is met. Therefore, personal jurisdiction is appropriate for all of the claims related to the Agreement except for the claim for intentional infliction of emotional distress.

Zaro presents a number of arguments in opposition, but none hold water.

Zaro argues that jurisdiction here is only based on a contract, but since the parties never formed a contract, there's no basis for the Court to exercise jurisdiction. While there is a contract attached to the pleadings, it isn't signed by anyone. (*See* Agreement at 6–7). But the existence of a contract isn't the subject of Zaro's motion to dismiss, and the Court won't determine whether a contract existed at this threshold stage. Moreover, even if ultimately the Court finds that there is no contract, Plaintiffs have pleaded alternative claims for relief on similar grounds, for example, Plaintiffs' claim for promissory estoppel. While a signed contract delivered to Plaintiffs in Ohio

would make the jurisdictional case even stronger, the Court acknowledges the lack of such a contract here and finds that jurisdiction is proper without one.

Zaro presents a couple of cases where courts found that minimum contacts didn't exist even where electronic communications were directed to the forum state. For example, one phone call, an in-person negotiation in Ohio, and a completed credit application forwarded to an Ohio address were not enough to constitute minimum contacts. *See Star Seal of Ohio, Inc. v. Tri State Pavement Supplies, L.L.C.*, No. 90-AP-969, 2010-Ohio-2324, ¶ 26 (10th Dist. 2010). But there, the Court reviewed evidentiary materials that indicated that the contract wasn't actually executed in Ohio, and, none of the terms of that contract required any performance by the defendant within the forum. Conversely here, Zaro made numerous contacts with Ohio, much more than one phone call. While she did not set foot in Ohio, she delivered Pepe to the Mustos in Erie, Pennsylvania knowing that they would take him to Ohio. The *Star Seal* court noted the lack of connection to Ohio by noting that no term of the contract would require the out-of-state defendant's performance in Ohio. But here, the essential performance piece for Zaro was to deliver Pepe to Plaintiffs and let them campaign him based out of Ohio. Pepe's presence with the Mustos in Ohio was essential to the parties' bargain, and Zaro knew that and she prevented that by taking Pepe back.

Finally, Zaro argues that the federal venue statute says that the default venue for a civil action is the residential location of a defendant. (Reply at 3, Doc. 15). But Zaro hasn't moved to dismiss for improper venue; she's moved to dismiss for lack of personal jurisdiction.

In short, Zaro's arguments don't persuade the Court.

**2. Defamation and Related Claims**

Second, does the Due Process Clause permit the Court to exercise personal jurisdiction over Zaro for the defamation-related claims? In short, yes, and it doesn't require nearly as much explanation as the first set of claims. The causes of action at issue here are: (9) defamation, (10) violation of the Ohio Deceptive Trade Practices Act, (11) false light, and (12) tortious interference with business relationships. (Compl. at ¶¶ 62–87). Defamatory statements published online about an Ohio resident and seen by Ohio residents is enough to subject the alleged defamer to personal jurisdiction in Ohio without offending the defendant's due process rights. *See Kauffman Racing Equip., L.L.C.*, 126 Ohio St. 3d 81.

Here, Plaintiffs assert that Zaro made multiple disparaging statements about the Mustos that were false and directed to or seen by "others in the pure-bred dog communicate, including residents of the State of Ohio." (Dave Musto Aff. at ¶ 35). Plaintiffs have alleged all they need to satisfy the standard in *Kauffman Racing Equipment*; therefore, asserting jurisdiction over Zaro for these claims doesn't offend due process.

**IV. Conclusion**

Defendants' Motion to Dismiss for Lack of Personal Jurisdiction is **GRANTED IN PART AND DENIED IN PART**. (Doc. 7).

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: March 30, 2018